UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JACQUELINE ALFONSO BARRY,　　　*
　　　　　　　　　　　　　　　　*
　　　　　　　　Plaintiff,　　　　*
　　　　　　　　　　　　　　　　*
　　　　v.　　　　　　　　　　　*　　　Civil Action No. 16-cv-12473-IT
　　　　　　　　　　　　　　　　*
THE TRUSTEES OF EMMANUEL　　　*
COLLEGE,　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　　　　Defendant.　　　　*

MEMORANDUM & ORDER

February 8, 2019

TALWANI, D.J.

I.　　　Introduction

Plaintiff Jacqueline Alfonso Barry brought the instant action alleging that Defendant The Trustees of Emmanuel College discriminated against her because of her sex and her pregnancy, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000-e2(a), and the Pregnancy Act of 1978 (Count 1); and because of her race and national origin discrimination, in violation of Title VII, 42 U.S.C. § 2000e *et seq,* and Mass. Gen. Laws. ch. 151B (Count 2). Second Am. Compl. ¶¶ 58–94 [#33]. Plaintiff further alleges that Defendant breached the terms of the contract that Defendant had with its faculty during its review of Plaintiff's application for promotion and tenure (Count 3). Id. at ¶¶ 95–104. Before the court is Defendant's Motion for Summary Judgment [#41].  For the following reasons, Defendant's motion is ALLOWED in part and DENIED in part.

II.　　　Factual Background

At summary judgment, the court views the record in the light most favorable to the non-

moving party and draws all reasonable inferences in her favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). However, the court does not accept "conclusory allegations, improbable inferences, and unsupported speculation." <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir. 2009).

### A. *The Parties*

Emmanuel College is a Catholic, liberal arts college in Boston, Massachusetts. Def.'s Statement of Material Facts ("Def.'s SOF") ¶ 1 [#43]. Defendant The Board of Trustees of Emmanuel College is the college's governing body. <u>Id.</u> ¶ 3. The Board of Trustees delegates day-to-day administration of college affairs to the President of the college and her administrators. <u>Id.</u> Sister Jane Eisner has served as Emmanuel College's President since 1979. <u>Id.</u> ¶ 5. In 2008, Emmanuel College hired Jacqueline Alfonso Barry as an Assistant Professor of Psychology. Pl.'s Statement of Material Facts ("Pl.'s SOF") Ex. 1 ("Barry Dep.") 10:4–21 [#48-2]. That position was a tenure-track position. Pl.'s SOF ¶ 2 [#48].

### B. *Emmanuel College's Alcohol Programming and Prof. Barry's Alcohol Education Research*

Beginning in the 1980s, Emmanuel College mandated students to complete an alcohol prevention program to receive specific housing privileges. Def.'s SOF Ex. 12 (June 2009, IRB application) 3-5 [#43-12]; Pl.'s SOF Ex. 3 ("Barry's Aff." Ex. 3: "Rissmeyer Oct. 2009 letter") 11 [#48-4]. During at least the last three years prior to the events at issue here, Emmanuel College had also required students to complete a three-month follow-up and analyzed the results to improve student services at Emmanuel College. June 2009 IRB application 3-5 [#43-12].

In 2009, after Prof. Barry gave a research lecture about evidence-based alcohol intervention programs, Emmanuel College's Dean of Students asked Prof. Barry to consult with the College's administrators on alcohol programming for incoming students. Barry Dep. at 12:2–

15 [#48-2]. After being asked to consult with College administrators on the alcohol programming, Prof. Barry submitted a proposal to the College's Institutional Review Board ("IRB"). Id. at 3. Pursuant to federal regulations, the IRB must review all proposed research with human subjects, unless the college determines that the specific research project is exempt from IRB approval. Def.'s SOF ¶ 25 [#43] (citing 45 C.F.R. §§ 46.107, 46.109). At the time of the events at issue here, Professor of Psychology Joyce Benenson was the chair of the IRB, and Professor of Philosophy Raymond Devettere was a member of the IRB. See DSOF ¶ 27 [#43]; PSOF ¶ 18 [#48].

Prof. Barry's proposal explained that Emmanuel College had made the decision to implement (beginning a few months later with the incoming freshman class) personalized feedback as part of the alcohol awareness program, and that she had been asked to assist with the data analysis. See June 2009 IRB application 3 [#43-12]. The proposal explained further that the freshman would be given either of two versions of the alcohol awareness program, one with personalized feedback only and the other with personalized feedback and social norms. Id. The surveys of alcohol use were to be collected without identifying information. Id. In her proposal, Prof. Barry explained that she was not intending to distribute a consent form because the students were required by Emanuel College to complete the alcohol prevention program and 3-month follow-up regardless of the statistical evaluation, and because the College in the past had not required consent despite analyzing those results. Id.

In a closed-door IRB meeting to review Prof. Barry's proposal, Prof. Benenson raised concerns that the proposal did not include sufficient provisions to obtain voluntary informed consent from the incoming students. Pl.'s SOF Ex. 6 ("Fiebig Letter") [#48-7]; Barry Dep. 17:2–18:14 [#48-2]. On June 19, 2009, the IRB rejected Prof. Barry's proposal because it did not

specify that Prof. Barry would obtain the voluntary informed consent of students whose data would be used in the research. Def.'s SOF Ex. 13 ("Benenson June 2019 letter") [#43-13]. Prof. Benenson encouraged Prof. Barry to resubmit her proposal with a consent form. Id.

Prof. Barry resubmitted a revised proposal to the IRB with a consent form. See Def.'s SOF ¶ 30 [#43]. On behalf of the IRB, Prof. Benenson wrote to Prof. Barry on July 10, 2009, expressing the IRB's concerns about the penalty that Prof. Barry proposed for students who chose not to participate in the survey. Def.'s SOF Ex. 14 ("Benenson July 2009 letter") [#43-14]. Prof. Barry did not initially respond to Prof. Benenson's letter, but later told Prof. Benenson that she was modifying the study. See Def.'s SOF Ex. 15 ("Benenson Oct. 2009 email) [#43-15].

On October 1, 2009, Prof. Barry submitted a revised proposal. Def.'s SOF Ex. 16 (Oct. 2009 IRB Proposal) [#43-16]; Def.'s SOF ¶ 31 [#43]. The proposal explained that, as of August 2009, incoming freshman students had completed two versions of alcohol-use surveys through the Student Affairs Office, but that Prof. Barry had not yet analyzed the data. Oct. 2009 IRB Proposal [#43-16]. Prof. Barry proposed that she proceed to analyze and compare the data obtained from these surveys. Id. Vice President for Student Affairs Patricia Rissmeyer was a co-applicant of the revised proposal. Rissmeyer Oct. 2009 letter 11 [#48-4].

After reading Prof. Barry's revised proposal, Prof. Benenson accused Prof. Barry of conducting the study that the IRB had rejected in July 2009, and informed other IRB members that Prof. Barry may have put Emmanuel College at legal risk by breaching ethical standards and contravening federal research regulations. Def.'s SOF Ex. 6 ("Benenson Dep.") 23:3–19 [#43-6]; Benenson Oct. 2009 email [#43-15]; Def.'s SOF Ex. 17 ("Oct. 2009 IRB email chain") [#43-17]. Vice President Rissmeyer wrote to Prof. Benenson to assure her that Student Affairs had not yet conducted any research, and that Prof. Barry's consultation with the Student Affairs office was

separate from the research proposed in the October 2009 IRB submission. Rissmeyer Oct. 2009 letter 11 [#48-4]. Despite Vice President Rissmeyer's letter, Prof. Benenson reached out to the federal Office for Human Research Protections for guidance. Benenson Dep. 37:19-21 [#43-6].

The IRB called Prof. Barry into a meeting on October 22, 2009. See Barry Dep. 29:7–30:1 [#48-2]. At the meeting, Prof. Devettere accused Prof. Barry of violating federal regulations and disobeying the IRB's denials of her proposals, and told Prof. Barry that he was going to report her to the federal regulators. Id. 31:13-32:16; Def.'s SOF Ex. 5 ("Devettere Dep.") 8:8–14 [#43-5].[1]

In 2010, Prof. Barry submitted a revised proposal, again co-sponsored by Vice President Rissmeyer, elaborating that she would only use data that was collected after she received IRB approval and would ensure the participants' voluntary informed consent. Def.'s SOF Ex. 18 ("June 2010 IRB Proposal") 3–4 [#43-18]. The IRB accepted this revised proposal. Def.'s SOF ¶ 35.

### C. The Timing of Prof. Barry's Maternity Leave and Tenure Application

Emmanuel College gives faculty members eight weeks of paid parental leave following a birth or adoption, and thereafter the faculty member can take an unpaid leave of absence for the rest of the academic semester, or exercise other options. See Def.'s SOF Ex. 10 (Emmanuel College Faculty Handbook ("Faculty Handbook")) 22-23 [#43-10]. In September 2012, Prof. Barry informed Emmanuel College that she was pregnant and planned to take maternity leave. Barry Dep. 34:8-23 [#48-2]. She subsequently took maternity leave from February 18, 2013, until the end of May 2013. Barry Aff. ¶ 2 [#48-4].

---

[1] Professor Barry was never informed if Prof. Devettere, Prof. Benenson, or anyone else made any such report. Barry Dep. 33:1-23 [#48-2].

At Emmanuel College, obtaining tenure assures academic appointment until retirement unless the tenured faculty member is terminated for cause. Faculty Handbook 13 [#43-10]. To be qualified for tenure, an associate professor must have completed a minimum of six academic years of full-time teaching. Id. at 15. Tenure track professors are generally required to apply for tenure during the first day of the fall semester of their sixth year of tenure-track teaching. Id. at 17-18. The six-year pre-tenure period is suspended during an approved maternity leave of absence, unless the faculty member requested in writing otherwise. Id. at 23. In accordance with the Handbook, Prof. Barry's pre-tenure probationary period clock was suspended during Prof. Barry's leave. Barry Dep. 36:4–8 [#48-2]. She therefore was not required to apply for promotion and tenure until September 2014, instead of September 2013. Id.

### D. Tenure Application Process

The Faculty Handbook outlines the steps of the tenure process. Tenure applications are due by the first day of the fall semester. Faculty Handbook 18 [#43-10].  At the first step, the Faculty Promotion and Tenure Committee ("Faculty Tenure Committee"), consisting of seven faculty members, evaluates the candidate's: (1) teaching effectiveness; (2) scholarship and professional achievement; and (3) engagement with the College and its mission. Id. at 16. To do so, the Faculty Tenure Committee evaluates reference letters from the applicant's department chair and colleagues and solicits feedback from three outside evaluators. Id. at 18-19. The Faculty Tenure Committee makes an initial recommendation whether to grant the applicant tenure. Id. at 11-12.  To recommend tenure, the Faculty Tenure Committee must find that the candidate is "strong in all three standards." Id. at 17-18. The Faculty Tenure Committee's recommendation, and reasons, therefore, must be provided to the candidate and to the Vice President of Academic Affairs by the first of February. Id. at 18-19. If the Faculty Tenure

Committee recommends not to grant tenure, the written reasons must help the candidate to prepare for an appeal, if an appeal is desired. Id. at 19.

At the second step, by March 7 of the applicant's sixth year, after meeting with three members of the Faculty Tenure Committee to review all recommendations, the Vice President of Academic Affairs and "the appropriate dean(s)" (referred to herein as the "Administrative Review Committee"[2]) make a recommendation to the President of the College regarding the application. Id. at 19. When this recommendation differs from that of the Faculty Tenure Committee, the Administrative Review Committee shall meet with the Faculty Tenure Committee to discuss the reasons. Id. at 20.

Both the Faculty Tenure Committee and the Administrative Review Committee must send the President of the College all materials from the candidate, and the references, evaluations, and the letter from the Faculty Tenure Committee explaining the basis for their decision. Id. If the Faculty Tenure Committee's decision is positive and the Administrative Review Committee's decision is negative, then the Administrative Review Committee shall provide the general reasons in a written letter to the candidate to help the candidate prepare for an appeal, should he or she wish to appeal. See id. at 20.

At the next step, the President makes her decision before the spring Board of Trustees meeting. Id. at 20. If the President makes a decision that differs from the recommendation of the Faculty Tenure Committee or the Administrative Review Committee, the President will meet with the Faculty Tenure Committee and the Administrative Review Committee to discuss the reasons for the reversal of the recommendation. Id. at 20. If the President's decision is negative,

---

[2] The handbook does not use this term, but the term is used here by counsel and by Dean of Arts and Sciences William Leonard. Def.'s SOF Ex. 15 ("Leonard Administrative Review Committee Recommendation") [#48-16].

then she shall give the general reasons in a written letter to the candidate to help the candidate prepare an appeal. See id. at 20.

If there is a negative recommendation by the Faculty Tenure Committee or the Administrative Review Committee, or a negative decision by the President, then the faculty member may file an appeal. Id.

The President's final negative decision is dispositive, whereas the President's positive recommendation is sent to the Board of Trustees to make the final decision. Id. at 18, 20.

*E. Prof. Barry's Tenure Application*

In September 2014, Prof. Barry submitted her application for promotion and tenure. Barry Dep. 36:9–19 [#48-2]. Prof. Benenson, the former IRB chair, was a member of the Faculty Tenure Committee in September 2014 but recused herself from reviewing Prof. Barry's application. Benenson Dep. 62:23–63:9 [#43-6]; Barry Dep. 185:10-24, 186:1-2 [#48-2]. In accordance with the Handbook, a substitute faculty member replaced Prof. Benenson on the Faculty Tenure Committee. Def.'s SOF ¶ 40 [#43].

The Faculty Tenure Committee reviewed Prof. Barry's application, course evaluations, and references, and, on January 29, 2015, recommended to President Eisner that Prof. Barry be awarded tenure. Pl.'s SOF Ex. 11 ("Faculty Tenure Committee Recommendation") [#48-12]. The Faculty Tenure Committee recommendation letter noted that Prof. Barry received positive teaching evaluations, had a consistent record of research and publication, and had a strong record of service to the college. See id. The letter pointed out that all three outside reviewers gave Prof. Barry favorable recommendations, but that one reviewer criticized Prof. Barry's research portfolio for the "relative lack of prestige of the journals in which she was published and the lack of externally funded research." Id.

By the time that the Faculty Tenure Committee had concluded its review, William Leonard was serving as the Dean of Arts and Sciences (and interim chief academic officer) and was a member of the Administrative Review Committee. See Def.'s SOF Ex. 4 ("Leonard Dep.") 7:2-24 [#43-4]; Eisner Dep. 29:1–9 [#43-8]; Pl.'s SOF Ex. 15 (Leonard Administrative Review Committee Recommendation Letter) [#48-16]. Emmanuel College's Vice President for Academic Affairs had left the college, however, and that position was vacant. Leonard Dep. 7:12-17 [#43-4]; Eisner Dep. 21:20–22:14 [#43-8]. President Eisner appointed Prof. Devettere— who had threatened to report Prof. Barry to federal regulators in 2009—as the second (and only other) person involved in the second step of the tenure review process. Eisner Dep. 31:13-32:8 [#43-8]. Prof. Devettere was not a dean at the time, although he had served as a dean previously. Id. at 42:7–12. President Eisner did not consult Prof. Barry or seek Prof. Barry's approval before making these appointments. Id. at 42:23–43:4. Upon hearing of Prof. Devettere's involvement in the tenure process, Prof. Barry expressed concern to a colleague that she and Prof. Devettere "have clearly had some IRB run-ins." Def.'s SOF Ex. 21 ("Pl.'s Feb. 2015 email") [#43-21].

On March 6, 2015, Dean Leonard sent a letter to President Eisner noting that the Administrative Review Committee was divided, but that he agreed with the Faculty Tenure Committee and recommended that Prof. Barry be awarded tenure. Leonard Administrative Review Recommendation Letter [#48-16]. Prof. Devettere drafted a separate undated document, stating that Prof. Barry had shown strong teaching and service to the College, but that he was uncertain as to whether her research and scholarship were sufficiently strong to warrant tenure. Pl.'s SOF Ex. 12 ("Devettere Administrative Review Recommendation Letter") [#48-13]. Prof. Devettere outlined several reasons, including that Prof. Barry had published only two studies that were published in "lower-ranked journals," that Prof. Barry's remaining publications were based

on her previous graduate school research, and that Prof. Devettere had questions regarding whether Prof. Barry obtained IRB approval for her studies. Id. Prof. Devettere commented that a "serious compliance issue" occurred in 2009 where Prof. Barry failed to obtain consent from students, and that Prof. Barry "had an extra year before seeking promotion and tenure due to a leave that stopped the tenure clock." Id. Prof. Devettere did not recommend Barry for promotion and tenure. Id.

On May 7, 2015, President Eisner met with the Faculty Tenure Committee, Dean Leonard, and Prof. Devettere to discuss Prof. Barry's application. Eisner Dep. 66:7–17 [#43-8]. President Eisner also invited Prof. Benenson to speak at the meeting. Id. at 65:12-66:17. At the meeting, the 2009 IRB incident was described to several members of the Faculty Tenure Committee for the first time. See id. 69:1–70:8. President Eisner then asked the members of the Faculty Tenure Committee whether, considering what they had just heard, they would change their votes. Benenson Dep. 37:2-9 [#43-6]. The majority of the Faculty Tenure Committee then agreed that denial of tenure was appropriate. Eisner Dep. 69:9–15 [#43–8].

On May 14, 2015, President Eisner sent Prof. Barry a list of questions. Pl.'s SOF Ex. 17 ("Eisner May 2015 letter") [#48-18]. Many of the questions addressed the issues that Prof. Devettere raised in his recommendation to President Eisner, including whether Prof. Barry had obtained IRB approval for several of her studies. Id. Two weeks later, Prof. Barry sent President Eisner a letter answering the questions. Pl.'s SOF Ex. 18 ("May 2015 Resp. Letter") [#48-19]. President Eisner provided a copy of Prof. Barry's responses to Prof. Devettere, who subsequently sent President Eisner a letter responding to Prof. Barry's answers and maintaining that Prof. Barry was not sufficiently qualified for tenure. Pl.'s SOF Ex. 13 ("Devettere June 2015, Letter") [#48-14].

On June 25, 2015, President Eisner notified Prof. Barry that her application for tenure had been denied because she had not shown sufficiently strong scholarship. Pl.'s SOF Ex. 19 ("June 2015 Tenure Rejection letter") [#48-20]. Prof. Barry filed an appeal with President Eisner on July 13, 2015, in which Prof. Barry compared her scholarship to two other recently promoted and tenured professors. Pl.'s SOF Ex. 20 ("Pl.'s Appeal letter") [#48-21]. President Eisner provided Prof. Barry's appeal letter to Prof. Devettere, and, in response, Prof. Devettere sent President Eisner comments critical of Prof. Barry's appeal.  See Pl.'s SOF Ex. 14 ("Devettere July 2015 letter") [#48-15]. Prof. Devettere noted that Prof. Barry's appeal did not mention that "her time frame for submitting material relevant to her scholarship and research in preparation for tenure has been significantly longer than the time frames [for her colleagues]."  Id.

President Eisner denied Prof. Barry's appeal on August 3, 2015, noting the President's "concerns about [Prof. Barry's] research methods and compliance with human research protocols and standards, and [Prof. Barry's] characterization of them." Pl.'s SOF Ex. 21 ("Appeal Denial") [#48-22]. Prof. Barry separated from Emmanuel College in January 2016. Def.'s SOF Ex. 2 ("Noonan Decl.") ¶ 5 [#43-2].

III.     Discussion

A.     Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is 'material' if it has the potential of determining the outcome of the litigation." Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012) (quoting Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir.

2009)). All reasonable inferences must be drawn in favor of the non-movant, but the non-moving party "cannot rely on speculation to avoid summary judgment." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 136 (1st Cir. 2013). Thus, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

B.       Breach of Contract (Count 3)

Prof. Barry claims that Defendant breached its contract with her by failing to follow the tenure process delineated in the Handbook in fifteen instances when reviewing her application. See Second Am. Compl. ¶ 105(a)–(o) [#33]. Because the court finds that genuine disputes of material fact exist as to whether Defendant breached its contractual arrangement by allowing Prof. Devettere to sit on the Administrative Review Committee as part of Prof. Barry's tenure application process, judgment as a matter of law is not warranted. Cf. Doe v. Trs. of Bos. Coll., 892 F.3d 67, 80 (1st Cir. 2018) ("Because we find that genuine disputes of material fact exist as to two of the [six preserved] alleged breaches, we hold the district court's grant of summary judgment . . . was improper.").

1.       Applicable Law and Legal Framework

Under Massachusetts law, a breach of contract claims requires a plaintiff to prove that she had a binding contract with the defendant, that the plaintiff was willing and able to perform under that contract, that defendant's breach prevented the plaintiff from performing, and that the plaintiff suffered damages. See Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996).

Massachusetts state courts have found that a college's faculty handbook may constitute a binding contract between that college and its faculty. See, e.g., Berkowitz v. Pres. & Fellows of

Harvard Coll., 58 Mass. App. Ct. 262, 269–70 (2003); Tuttle v. Brandeis Univ., 2002 WL 202470, at *9 (Mass. Super. Ct. Feb. 4, 2002) ("Under appropriate circumstances, promises contained in a personnel manual, like the Faculty Handbook, can be binding on an employer and effectively become terms of an employment contract." (citing O'Brien v. New Eng. Tel. and Tel. Co., 422 Mass. 686, 691 (1996))); cf. Schaer v. Brandeis Univ., 432 Mass. 474, 476 (2000) (student handbook may be a contract between the institution and its students). For purposes of summary judgment, Defendant does not dispute that the Faculty Handbook was a binding contract. Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Mem.") 14 [#42]. Defendant does dispute, however, that it breached that contract or that any such breach was material. Id.

        2. Breach of Contract

        In interpreting the Handbook, the court is guided by two principles. First, the court "employ[s] the 'standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" Berkowitz, 58 Mass. App. Ct. at 269 (quoting Schaer, 432 Mass. at 478). At the same time, the court must "adhere to the principle that '[c]ourts are chary about interfering with academic . . . decisions made by private colleges and universities.'" Id. (quoting Schaer, 432 Mass. at 482). Thus, "in the absence of a violation of a reasonable expectation created by the contract, . . . or arbitrary and capricious conduct by the university, . . . courts are not to intrude into university decision-making." Id. at 269-70 (citing Schaer, 432 Mass. at 478, and Coveney v. Pres. & Trs. of the Coll. of the Holy Cross, 388 Mass. 16, 19–20 (1983)).

        According to the Faculty Handbook, following the Faculty Tenure Committee's consideration of an application for promotion and tenure, the Vice President of Academic Affairs and the "appropriate dean(s)" review the Faculty Tenure Committee's recommendation and then

makes their own recommendation to the President. Faculty Handbook 19 [#43-10]. The Vice President of Academic Affairs position was vacant at the time the Faculty Tenure Committee had completed its review of Prof. Barry's tenure application, and President Eisner appointed Prof. Devettere to serve on the committee instead. Def.'s SOF ¶ 43–48 [#43].

Defendant contends that because the Vice President of Academic Affairs position was vacant, it was impossible to comply with the "technical" requirements of the Faculty Handbook. It "therefore fell to the College to devise a mechanism to most closely approximate the Faculty Handbook's conception of an administrative review committee consisting of the [Vice President of Academic Affairs] and appropriate deans." Def.'s Mem. 16 [#42]. But Defendant does not explain why it could not have complied with its contractual obligations by appointing an interim Vice President of Academic Affairs, and offers no legal authority to support its position that the President may unilaterally modify the terms of the tenure process. Nor has Defendant pointed to any provision of the Faculty Handbook that puts faculty members on notice that the President may make modifications to the tenure process. In fact, the Faculty Handbook provides that "all proposed changes [concerning faculty employment conditions] will be submitted to the Faculty Senate. . . . Final authority to change this Handbook rests with the Board of Trustees." Faculty Handbook 3 [#43-10]. There is no evidence that any changes were submitted to the Faculty Senate, or that the Board of Trustees changed the tenure process in light of the vacant position or gave the President the unilateral authority to do so. Thus, it remains a genuine issue whether President Eisner breached Prof. Barry's contract by unilaterally modifying its terms and appointing Prof. Devettere to the Administrative Review Committee.

Moreover, there is a genuine dispute of material fact as to whether allowing Prof. Devettere and Prof. Benenson's participation in Prof. Barry's tenure review process violated

Prof. Barry's reasonable expectation of fairness. Early on in her pre-tenure period, Prof. Devettere and Prof. Benenson accused Prof. Barry of violating federal regulations and Prof. Devettere threatened to report Prof. Barry to federal regulators. <u>See</u> Benenson Dep. 23:3–19 [#43-6]; Benenson Oct. 2009 email [#43-15]; Oct. 2009 IRB email chain [#43-17]; Barry Dep. 31:13-32:16 [#48-2]; Devettere Dep. 8:8–14 [#43-5]. At least one other IRB member described Prof. Devettere and Prof. Benenson as having "subjected [Prof. Barry's research proposals] to an unprecedented degree of scrutiny and criticism . . . distinct from any other proposals submitted to the IRB[,] which could be interpreted as a focus pursuit against [Prof. Barry]." Fiebig letter [#48-7]. In fact, that IRB member went as far as to describe Prof. Benenson and Prof. Devettere's actions as a "de facto 'witch hunt.'" <u>Id.</u>

It is not for the court to determine whether these IRB members' criticisms of Prof. Barry's research were substantively correct. The court notes, however, that Emmanuel College was free to terminate Prof. Barry's "probationary" pre-tenure employment at the time. It did not, and instead, at the time of the events at issue, at least some college administrators (who had sought Prof. Barry's participation in the project presented to the IRB in the first place) sided with Prof. Barry. The court notes further that, at least as described here, the criticisms of Prof. Barry's research proposal could well have been similarly directed to Emmanuel College's long-standing mandate (unrelated to Prof. Barry) for students to complete an alcohol prevention program to receive specific housing privileges, and Emmanuel College's apparent use of students' responses without their consent. In any event, despite Prof. Benenson and Prof. Devettere's criticisms, Emmanuel College did not terminate Prof. Barry at the time, and Prof. Barry was permitted to continue her research and her pursuit of tenure over the next five years without any notice of the outsized role (not contemplated in the Faculty Handbook) that these two faculty members would

be given in the consideration of her tenure application.

"Academic adversaries . . . are not meant to be excluded from the [tenure] process," Berkowitz, 58 Mass. App. Ct. at 273, and a fact-finder may find that no breach of contract occurred. But, considering the detailed and comprehensive procedure set forth in the Faculty Handbook, a fact-finder may conclude that it was reasonable for Prof. Barry to expect that the individuals formally participating in the review of her tenure application would be unbiased. Indeed, it is hard to imagine why Prof. Barry would have stayed at Emmanuel College following the IRB interactions if she had been alerted to the role these faculty adversaries would be afforded in the tenure review process, despite the Administration's encouragement of the project throughout the dispute and the IRB's eventual approval of that project. And a reasonable jury could thus find that allowing Prof. Devettere and Prof. Benenson to be involved in the formal portions of Prof. Barry's tenure review process was a violation of her reasonable expectation that she would receive a fair process.

Notably, this expectation of fairness may have been shared by other faculty members at Emmanuel College, including two other IRB members and the former Vice President of Academic Affairs, Joyce DeLeo, all of whom advised Prof. Benenson to recuse herself from the Faculty Tenure Committee during its review of Prof. Barry's application. Barry Dep. at 186:1-2 [#48-2]; Benenson Dep. 62:23–63:9 [#43-6]. Professor Benenson presumably agreed that her involvement would at least present an improper appearance given that she agreed to recuse herself from the Faculty Tenure Committee on which she would otherwise have been serving.

Prof. Devettere, however, did not recuse himself from reviewing Prof. Barry's application for tenure, despite the same concerns with his participation, and even though he held no administrative position giving him a formal role in the tenure review process according to the

16

Faculty Handbook. And once Prof. Devettere recommended denial of tenure, President Eisner included him in forming further questions and reviewing Prof. Barry's responses, and invited Prof. Benenson (despite her prior recusal) to present the 2009 IRB issue to the Faculty Tenure Committee and the Administrative Review Committee at a meeting entirely outside of the tenure process identified in the Faculty Handbook. This outsized involvement by Prof. Devettere and Prof. Benenson in the tenure process gives rise to a genuine dispute as to whether Defendant breached the terms of its contract with Prof. Barry. Therefore, Defendant's <u>Motion for Summary Judgment</u> [#41] as to Prof. Barry's breach of contract claim (Count 3) is DENIED.

      C.      Sex and Pregnancy Discrimination (Count 1)

          1.  <u>Applicable Law and Legal Framework</u>

Prof. Barry further alleges that Defendant denied her application for promotion and tenure because of her sex and pregnancy. Second Am. Compl. ¶ 68 [#33].[3] She argues that there is both direct and circumstantial evidence of this discrimination. Pl.'s Opp'n 9–11 [#47].

The analysis used to prove discrimination depends on whether there is direct or circumstantial evidence of discrimination. <u>See</u> <u>Smith v. F.W. Morse & Co.</u>, 76 F.3d 413, 420-21 (1st Cir. 1996). If a plaintiff presents direct evidence that a discriminatory animus was "a motivating factor in the employment action," "the burden of persuasion [shifts] from the employee to the employers . . . [to] affirmatively prove that it would have made the same decision even if it had not taken the protected characteristic into account." <u>Id.</u> at 421. If a plaintiff has only circumstantial evidence of discrimination, she may still attempt to prove her

---

[3] Prof. Barry has briefed her pregnancy discrimination claim under state and federal law, <u>see</u> Pl.'s Opp'n 9 [#47], but her <u>Second Amended Complaint</u> [#33] only alleges violations of federal law, <u>see</u> Pl.'s Second Am. Compl. ¶¶ 58–72 [#33]. Because the <u>Second Amended Complaint</u> [#33] defines the claim, the court considers only federal law here.

case by resort to the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Id.</u>

The first prong of the <u>McDonnell Douglas</u> analysis requires that "the complainant . . . carry the initial burden . . . of establishing a prima facie case of . . . discrimination." 411 U.S. at 802. To establish a prima facie case of discrimination in connection with tenure, a plaintiff must show that: 1) she is a member of a protected class; 2) she was qualified for tenure; 3) she suffered an adverse employment action; and 4) there is evidence of a "causal connection between her membership in a protected class and the adverse employment action." <u>Bhatti v. Tr. of Bos. Univ.</u>, 659 F.3d 64, 70 (1st Cir. 2011) (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993)). To show that she was qualified for tenure, a plaintiff tenure applicant must show "that [her] qualifications were at least sufficient to place [her] in the middle group of tenure candidates as to whom a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion." <u>Kumar v. Bd. of Tr., Univ. of Mass.</u>, 774 F.2d 1, 14 (1st Cir. 1985) (quoting <u>Banerjee v. Bd. of Tr. of Smith Coll.</u>, 648 F.2d 61, 63 (1st Cir. 1981)).

If a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the [adverse employment action]." <u>McDonnell Douglas</u>, 411 U.S. at 802. If the defendant can so articulate, "the burden shifts back to [the plaintiff] to show that the reason was a coverup for a discriminatory decision." <u>Benoit v. Tech. Mfg. Corp.</u>, 331 F.3d 166, 174 (1st Cir. 2003) (quoting <u>Straughn v. Delta Air Lines, Inc.</u>, 250 F.3d 23, 34 (1st Cir. 2001)). Specifically, a plaintiff must "produce sufficient evidence to create a genuine issue of fact as to two points: 1) the employer's articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employer's actions was discriminatory animus."

Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015) (quoting Mariani–Colón v. Dep't of Homeland Sec., 511 F.3d 216, 223 (1st Cir. 2007)).

The First Circuit has emphasized the inherent subjectivity of decisions to grant or deny tenure and has advised district courts to refrain from "substitut[ing] [their] own views concerning the [plaintiff tenure applicant's] qualifications for those of the properly instituted authorities." Brown v. Tr. of Bos. Univ., 891 F.2d 337, 346 (1st Cir. 1989). However, as with other forms of discrimination, the court may infer discrimination if a defendant's reasons for denying tenure are "'obviously weak or implausible,' or that the tenure standards for prevailing at the tenure decisions were 'manifestly unequally applied.'" Id. (quoting Kumar, 774 F.2d at 12). An inference of discrimination, therefore, should only be made if "the denial of tenure was 'obviously' or 'manifestly' unsupported." Id.

### 2. Claim of Direct Evidence of Gender Discrimination

Here, Prof. Barry points to Prof. Devettere's two comments that she had extra time to submit relevant materials for her application for tenure, and President Eisner's admission that she relied in part on Prof. Devettere's review of Prof. Barry's responses to President Eisner's May 2015 letter, as direct evidence of discrimination since the additional time afforded to her was related to her maternity leave. Pl.'s Opp'n 9–11 [#47] (citing to Eisner Dep. 62:20–24 [#48-5]; Devettere March 2015 letter [#48-13]; Devettere July 2015 letter [#48-15]). Prof. Devettere's statements that Prof. Barry had a full additional year for meeting tenure criteria, as compared to other faculty members, suggest that he may indeed have considered her time on maternity leave as time during which she should have been publishing. But he combined that criticism with comments regarding additional time she had available while not on leave (the balance of the additional year before tenure review and during the appeal), making his comparisons with other

faculty members less clear. See Devettere July 2015 letter 1-2 [#48-15]. In any event, President

Eisner, not Prof. Devettere, was the final decision maker, and while President Eisner admittedly

relied in part on Prof. Devettere's review, the part she relied on appears to be his much more

strongly articulated view of Prof. Barry's alleged failings during the IRB process rather than her

comparative publication rate. The evidence is thus ambiguous, and "inherently ambiguous

statements do not qualify as direct evidence." Weston-Smith v. Cooley Dickinson Hosp., Inc.,

282 F.3d 60, 65 (1st Cir. 2002). Therefore, the McDonnell Douglas burden-shifting framework

guides the court's analysis.

> 3. Indirect Claim - Prima Facie Case of Gender/Pregnancy Discrimination

The parties do not dispute that Prof. Barry is a member of a protected class, that she was

denied tenure, and that other faculty members who were not members of that protected class

were granted tenure during the relevant time period.  Pl.'s SOF ¶¶ 3, 25, 62 [#48]; Def.'s SOF

¶¶ 37, 63, 68–72 [#43]. Thus, the only disputed issue at the prima facie stage is whether Prof.

Barry was qualified for tenure.

Defendant argues that since President Eisner and some faculty members determined that

Prof. Barry's research and scholarship were not sufficiently strong, no reasonable factfinder

could conclude that Prof. Barry was qualified for tenure. See Def.'s Mem. 6-7 [#42]. But the

Faculty Tenure Committee recommended that Prof. Barry be granted tenure, which required

those faculty members to have found that she was sufficiently strong in all three required fields,

including research and scholarship. Def.'s SOF ¶ 42 [#43]. Further, all three outside reviewers

during the Faculty Tenure Committee's review agreed that Prof. Barry should have been granted

tenure. See id. Dean Leonard also agreed and found Prof. Barry's research and scholarship

sufficient to warrant a positive recommendation for tenure in his role on the Administrative Review Committee. Id. ¶ 57.

To meet her burden at the prima facie stage, Prof. Barry need only show that she was "sufficiently qualified to be among those persons from whom a selection . . . would be made." Banerjee, 648 F.2d at 63. Given these differences in opinion, a reasonable jury could conclude that Prof. Barry was qualified for promotion and tenure under the school's standards. Accordingly, she has satisfied her burden at the first stage of the McDonnell Douglas framework. See, e.g., Villanueva v. Wellesley Coll., 930 F.2d 124, 129 (1st Cir. 1991).

### 4. Indirect Claim - Defendant's Legitimate, Non-discriminatory Reason

The burden shifts back to the Defendant to articulate a "legitimate, nondiscriminatory reason" for denying Prof. Barry's application for tenure. McDonnell Douglas, 411 U.S. at 802. Defendant's burden is one of production, not one of persuasion. See Fields v. Clark Univ., 966 F.2d 49, 51 (1st Cir. 1992) ("The defendant must meet a burden of production by articulating a legitimate, nondiscriminatory reason for its challenged actions.").

Defendant has met its burden. According to President Eisner's letter notifying Prof. Barry that her application had been denied, Prof. Barry was denied tenure because she had not demonstrated that her scholarship and professional achievement were strong enough. June 2015 Tenure Rejection letter [#48-20]. In response to Prof. Barry's appeal, President Eisner wrote that Prof. Barry's was denied tenure because of President Eisner's "concerns about [Prof. Barry's] research methods and compliance with human research protocols and standards, and [Prof. Barry's] characterization of them." Appeal Denial [#48-22]. Although President Eisner's May 2015 meeting with the Faculty Tenure Committee, Dean Leonard, and Professor Devettere may have violated the Handbook's procedural guarantees, the members of the Faculty Tenure

Committee agreed with President Eisner's decision to deny Prof. Barry's tenure application after learning about Prof. Barry's prior run-ins with the IRB.[4] See Eisner Dep. 69:9–15 [#43-8].

Accordingly, Defendant has provided a legitimate, non-discriminatory reason for denying Prof. Barry promotion and tenure, and the burden shifts back to her.

### 5. Indirect Claim – Pretext

At the final stage, Prof. Barry bears the burden of persuasion, where she must show that Defendant's reason was pretextual and, "by process of eliminating legitimate reasons, that the decision was governed by an illegitimate one." Banerjee, 648 F.2d at 63 (citing Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Prof. Barry "must convince a trier of fact, by a preponderance of the evidence, that the defendant's articulated reasons . . . were *obviously* weak or implausible, or that the tenure standards for prevailing at the tenure decisions were *manifestly* unequally applied." Villanueva, 930 F.2d at 129. (internal quotation marks omitted) (emphasis added). "Introducing evidence that [Prof. Barry] was as qualified as other tenure candidates does not suffice." Id. at 131.

Prof. Barry argues that President Eisner presented two different reasons for denying Prof. Barry's application for tenure. In President Eisner's first letter notifying Prof. Barry that her application for tenure had been denied, President Eisner wrote that Prof. Barry had "not demonstrated the level of scholarship that would justify promotion and tenure." June 2015 Tenure Rejection letter [#48-20]. After Prof. Barry appealed, President Eisner wrote that:

> Because of my concerns about your research methods and compliance with
> human research protocols and standards and your characterization of them, I

---

[4] Although the IRB's conclusions about Prof. Barry's proposals may (or may not) have been valid, what matters for purposes of this analysis is whether the final decision maker, President Eisner, has provided a non-discriminatory reason for denying Prof. Barry's tenure application in light of the information that President Eisner was given.

remain of the view that it is not in the best interests of the college to grant you
tenure.

Appeal Denial [#48-22]. Prof. Barry contends that President Eisner's "inconsistent and changing rationale demonstrates that a genuine issue of material fact exists regarding whether Defendants' reasoning is a mere pretext for discrimination." Pl.'s Opp'n 17 [#47].

Had President Eisner's denial of Prof. Barry's application solely been based on Prof. Barry's level of scholarship generally, the court would be likely to agree that the true motivation behind the denial of Prof. Barry's application may be suspect considering the initial recommendation by the Faculty Tenure Committee and Dean Leonard that Prof. Barry's professional achievements were sufficiently strong to justify granting her tenure. But President Eisner did not rest her decision upon Prof. Barry's scholarship generally, but rather made clear through the questions she asked Prof. Barry after receiving Prof. Devettere's letter, and in her Appeal Denial, that she had "concerns about [Prof. Barry's] research methods and compliance with human research protocols and standards, and [Prof. Barry's] characterization of them." Appeal Denial [#48-22]. That President Eisner used general language in the Tenure Rejection Letter and revealed her focused reason in the Appeal Denial does not, by itself, support the claim that her reason was pretextual, and that the true reason behind the denial of Prof. Barry's application was because she took maternity leave.

The court notes that it was not until Prof. Devettere's involvement in Prof. Barry's application review process that anyone recommended that Prof. Barry not be granted tenure. And although Prof. Devettere did mention in his letters the additional time Prof. Barry had in an apparent effort to diminish her scholarship generally, his primary focus appears to have been IRB related issues. For example, he asserted that: Prof. Barry did not have IRB approval for one study that she included in her application materials; Prof. Barry's application materials

purportedly "misrepresented" that she had IRB approval for one study; Prof. Barry had not indicated whether she obtained IRB approval—nor was their documentation to indicating IRB approval— for two manuscripts that she listed as "under review," and another that she listed as "in preparation"; in 2013, Prof. Barry declined to take the IRB's suggestion that she make changes to a research protocol, which Prof. Devettere stated was "extremely rare"; and that there was a "serious compliance issue" in 2009 in which the IRB believed that Prof. Barry failed to obtain consent from student subjects of research. Devettere March 2015 letter [#48-13].

Moreover, after Prof. Benenson spoke to the Faculty and Tenure Committee and Dean Leonard about the 2009 IRB incident, most of the Faculty and Tenure Committee members concluded that denying tenure was appropriate. See Benenson Dep. 37:1–4 [#43-6]; see also Eisner Dep. 69:1–17 [#43-8]. Although Prof. Barry points out that President Eisner requested that the Faculty Tenure Committee re-vote after hearing about the incident, see Pl.'s SOF ¶ 58 [#43], the fact that the majority of the members changed their recommendation when told of the 2009 IRB incident is strong evidence that President Eisner's stated basis for denying Prof. Barry tenure—her concerns with Prof. Barry's "research methods and compliance with human research protocols and standards, and [Prof. Barry's] characterization of them"— was not *obviously* weak or implausible. Appeal Denial [#48-22].

Nor has Prof. Barry shown that Defendant's tenure process was "manifestly unequally applied." To show that the tenure process was manifestly unequally applied, Prof. Barry may show that Defendant treated a similarly situated employee differently than it treated her. See Benoit, 331 F.3d at 174; cf. Villanueva, 930 F.2d at 131 (tenure applicant plaintiff may offer evidence of similarly situated candidates who received a promotion as evidence of pretext); Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir.1996) (individuals with whom

a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them for it).

In her appeal, Prof. Barry compared herself to Profs. Lin and Jarvinen, two psychology professors that had been recently awarded tenure. Pl.'s Appeal Letter [#48-21]. Prof. Barry's comparison focused on the fact that she had published at least as many articles as those two professors but was cited in other articles more often that the other two professors. Id. Prof. Barry also points out that Dr. Clare Mehta, who co-authored three different publications with Prof. Barry but did not taken maternity leave, was awarded tenure. Pl.'s Opp'n 11 [#47]; Pl.'s SOF Ex. 8 ("Dr. Mehta Dep.") 31:8–11 [#48-9].

Prof. Barry does not, however, make a true comparison between herself and other promoted professors who had issues like those that President Eisner found concerning. Notably, Prof. Barry's comparison makes no mention of whether Prof. Lin, Prof. Jarvinen, or Dr. Mehta had any prior compliance issues with IRB protocols before being promoted. Similarly situated defendants must have engaged in the same conduct, yet there is no evidence that any of the comparators had a problematic track record with respect to obtaining or properly representing whether they obtained IRB approval.[5] It is not enough for Prof. Barry to compare her qualifications to those of Profs. Jarvinen and Lin solely on the basis of her publication output; she must in fact show that they were similarly situated. See Perkins, 78 F.3d at 751.

Nor does Prof. Barry provide the court with any evidence that other women qualified for tenure who took maternity leave were denied promotions. Rather, the record evidence shows that between 2009 and 2016, five tenure candidates had their tenure clocks paused due to parental

---

[5] The court, again, does not opine as to the validity of the IRB issues.

leave, and Prof. Barry was the only one denied tenure. Noonan Decl. ¶ 6 [#43-2]. In the same

year that Prof. Barry submitted her application, Prof. Devettere recommended another candidate

who had "stopped the clock" due to maternity leave. Id. ¶ 8; Def.'s SOF Ex. 33 ("Devettere

March 9, 2015, email") [#43-33]; Def.'s SOF Ex. 34 ("Johnston ARC recommendation") [#43-

34]. Prof. Barry has therefore failed to show that Defendant's tenure process was *manifestly*

unequally applied. See, e.g., Benoit, 331 F.3d at 174.

Prof. Barry contends that Prof. Devettere's "disdain" for Prof. Barry's maternity leave is

circumstantial evidence of pretext. Pl's Opp'n 17 [#47]. However, even presuming *arguendo* that

Prof. Devettere's comments displayed a clearly discriminatory animus, Prof. Barry has presented

no evidence that President Eisner—the decision maker—based her decision to deny Prof. Barry

tenure solely on Prof. Devettere's, or anyone else's, recommendation. Rather, after reviewing all

the materials and recommendations, including asking Prof. Barry a "long series of questions,"

see Eisner May 2015 letter [#48-18], President Eisner explicitly stated her reason for denying

Prof. Barry tenure: her concern over Prof. Barry's compliance with research protocols, Appeal

Letter [#48-22].

Prof. Barry says that the school's failure to follow the precise tenure procedures outlined

in the Faculty Handbook also constitutes evidence of pretext. Pl's Opp'n at 14 [#47]. For

support, Prof. Barry cites an unpublished Sixth Circuit case, DeBoer v. Musashi Auto Parts, Inc.,

124 F. App'x. 387, 392–93 (6th Cir. 2005) (unpublished). While the DeBoer court acknowledged

that an employer's failure to follow protocol *may* constitute relevant evidence of pretext, it did

not find a deviation from protocol to constitute *per se* evidence of pretext. Compare id. at 394

(failure to follow detailed tenure procedures was one fact that, taken in combination with two

other salient facts, got the plaintiff past the summary judgment hurdle) with Skalka v. Fernald

Envtl. Restoration Mgmt. Corp., 178 F.3d 414, 422 (6th Cir. 1999) (where employer previously relied solely upon its own procedures to justify other layoffs, the jury was entitled to disbelieve employer's "conveniently identified flaws in the process" argument as to the plaintiff). The Deboer court itself found the employer's failure to follow protocol in that case was of "small probative value." Deboer, 124 F. App'x at 394.

Unlike in Skalka, Defendant does not argue that the tenure review process used to evaluate all other applicants during the relevant time period was insufficient to evaluate Prof. Barry's application. In fact, Prof. Barry does not dispute that all tenure applications for the 2014-2015 academic year, regardless of whether the applicant took maternity leave, were reviewed by Prof. Devettere and Dean Leonard. Def.'s SOF ¶ 45. Like in Deboer, Defendant's failure to strictly follow the tenure process here is of "small probative value," but, without more, does little to demonstrate that President Eisner's stated reason was pretextual.

Prof. Barry is unable to show that Defendant's justification for denying her tenure, because of the concerns with Prof. Barry's history with the IRB, was pretextual, and that the true reason was because of Defendant's discriminatory animus towards her pregnancy. Defendant's Motion for Summary Judgment [#41] is therefore ALLOWED as to Prof. Barry's sex and pregnancy discrimination claim (Count 1).

D.      Race and National Origin Discrimination (Count 2)

Prof. Barry does not claim any direct evidence of discrimination, and therefore once again finds herself in the world of McDonnell Douglas.

Again, to establish her prima-facie case of race and national origin discrimination, Prof. Barry must show that she was a member of a protected class; that she was qualified for tenure; that her tenure application was rejected; and that others were granted tenure in the same relative

time period as Prof. Barry's rejection. See Banerjee, 648 F.2d at 62. It is undisputed that Prof.

Barry is Latino and is therefore a member of a protected class. Pl.'s SOF ¶ 5 [#48]. Defendant

does not dispute that Prof. Barry's tenure application was rejected, or that others were granted

tenure during the school year. And, as previously stated, a reasonable jury could find that Prof.

Barry was qualified for tenure. Supra Section III(C)(3). Therefore, Prof. Barry has established a

prima facie case of race and national origin discrimination. And, because Defendant offered a

legitimate, non-discriminatory reason, see supra Section III(C)(4), the burden falls on Prof.

Barry to provide evidence of pretext. She has failed to do so.

Prof. Barry presents two facts to support of her claim of race and national origin

discrimination. First, Prof. Barry states that she was the only person of Hispanic origin at

Emmanuel College who pursued tenure for a subject area other than Spanish language or Latin

history. Pl.'s Opp'n. 20 [#47]; Pl.'s SOF ¶ 7 [#48]. Second, Prof. Barry says that President

Eisner's "attitude towards [her] soured significantly after [President] Eisner met [Prof.] Barry's

Latino mother." Pl.'s Opp'n 20 [#47]; Pl.'s SOF ¶ 6 [#48]. Prof. Barry's asserts that, in the years

after she introduced her mother to President Eisner, President Eisner became "distant and cold"

towards her. Pl.'s Aff. ¶¶ 4–8 [#48-3].

But Prof. Barry fails to provide any evidence whatsoever, other than speculation, that this

shift in President Eisner's demeanor had anything to do with Prof. Barry's race or national

origin. Prof. Barry also fails to show why her being the only professor of Hispanic heritage to

pursue tenure in an area other than Spanish language or Latin history supports her claim of race

discrimination. Defendant points out that three Hispanic candidates applied for tenure at

Emmanuel College between 2009 and 2016, and Prof. Barry was the only one amongst them to

whom President Eisner denied tenure. Noonan Decl. ¶ 6-7 [#43-2]. Furthermore, none of the

other five faculty members denied tenure during the 2009-2016 period were Hispanic. Id. ¶ 6. Accordingly, Prof. Barry has failed to show that President Eisner's legitimate, non-discriminatory reason for denying her application for tenure was pretextual.

Finally, Prof. Barry acknowledges that her original application to Emmanuel College made "repeated references to [her] being a bicultural and bilingual Latina." Pl.'s Aff. ¶ 9 [#48-4]. While not itself dispositive, that Prof. Barry was hired as a tenured-track professor after making repeated references to her national and cultural heritage cuts against her claim of race and national origin discrimination.

As Prof. Barry's claim of race or national origin discrimination amounts to mere speculation, it cannot survive summary judgment. See Medina-Rivera, 713 F.3d at 136 (claims of discrimination based solely on speculation cannot survive summary judgment). Defendant's Motion for Summary Judgment [#41] as to Prof. Barry's race and national original discrimination claim (Count 2) is ALLOWED.

IV.    Conclusion

For the aforementioned reasons, Defendant's Motion for Summary Judgment [#41] is ALLOWED as to Count 1 (gender/pregnancy discrimination) and Count 2 (race/national origin discrimination), and DENIED as to Count 3 (breach of contract).

IT IS SO ORDERED.

Date: February 8, 2019                                    /s/ Indira Talwani
                                                         United States District Judge